|  |  |  |
|---|---|---|
| IN RE SWISHER HYGINE, | ) | |
| INC. SECURITIES AND | ) | Member case 3:14-cv-2387 |
| DERIVATIVE LITIGATION | ) | |

## ORDER

**THIS MATTER** is before the Court on Defendants' Motions to Dismiss (Doc. Nos. 74, 76, 78, 79) and supporting briefs (Doc. Nos. 75, 77, 80), Plaintiffs' Responses in Opposition (Doc. Nos. 81, 82, 83, 84), Defendants' Replies (Doc. Nos. 85, 86, 87, 88), and the parties' briefs regarding supplemental authority (Doc. Nos. 109 & 111). On July 22, 2014, the Court held a hearing and heard oral argument on this and other matters relating exclusively to the *Miller* action (Member Case No. 3:14-cv-2387). For the reasons set forth below, those motions are **GRANTED in part and DENIED in part**.

## I. BACKGROUND

This case is part of a larger multidistrict litigation case captioned *Swisher Hygiene, Inc., Securities and Derivative Litigation*, which was centralized before this Court on August 13, 2012 by order of the Judicial Panel on Multidistrict Litigation ("JPML"). (*See* Doc. No. 1). It centers around "factual issues arising from allegations that defendants made false and/or misleading statements and/or failed to disclose that Swisher was improperly accounting for business transactions, and was improperly calculating its allowance for doubtful accounts receivable." (*Id.*) The facts central to these allegations arose after Swisher announced in March 2012 that it would be unable to timely report its 2011 year-end financial results because its audit committee was investigating possible accounting

1

errors relating to business acquisitions and accounts receivable. (*See* Complaint, Member Case No. 3:14-cv-2387 Doc. No. 1, ¶ 86).

The principal Plaintiffs in this member case are Glen Miller and Neal Rodrigue, whose company, Choice Environmental Services, Inc., ("Choice") was acquired by Swisher in March 2011. (*See* Compl. ¶ 37). At the time merger discussion began in December 2010, Miller and Rodrigue had built Choice into a multi-million dollar waste management business that operated in multiple counties throughout Florida. (*See* Compl. ¶ 24). The Complaint alleges that those discussions began with a telephone call from Defendant Wayne Huizenga to Miller, who was at the time the Chairman and Chief Executive Officer of Choice. (*Id.*) Miller was familiar with and impressed by Huizenga's past "mega-success" within the waste management industry, including his work with companies Waste Management and Republic Services. (Compl. ¶ 25). Huizenga was now Chairman of the Board of Swisher, and allegedly assured Miller that Miller would be able to build Choice into one of the premier waste management companies in the country under the guise of Swisher. (*Id.*)

Merger discussions continued in January 2011, when Huizenga and Steven Berrard—the President and CEO of Swisher—met face-to-face with Miller and Rodrigue. (Compl. ¶ 26). At the meeting, Berrard allegedly touted that his team was "capable of doing a deal a day," and expressed his robust confidence that Swisher could successfully execute an aggressive growth strategy, not unlike Berrard and Huizenga's past successes. (*Id.*) In support of these assurances, Berrard and Huizenga sent Plaintiffs an investment report dated January 7, 2011, which "reinforced both Huizenga's and Berrard's above sentiments on Swisher." (Compl. ¶ 27). The Complaint alleges that Berrard and Huizenga made

various other assurances during the merger negotiations, including that "Swisher would effectively operate as a bank for Choice's growth," that "Choice might eventually be spun off into a public company separate from Swisher," and that Plaintiffs would be able to "cash out a portion of their ownership interest of [Swisher]" because they would acquire shares "that could be freely sold in the public markets." (Compl. ¶¶ 28-30).

The Complaint acknowledges that "Plaintiffs Miller and Rodrigue—a former licensed [CPA]—both individually and personally, along with their then-legal representative(s), conducted their own due diligence on Swisher" before consummating the transaction. (Compl. ¶ 32). On February 13, 2011, the parties executed a merger agreement for Swisher's acquisition of Choice. (Compl. ¶ 37; *see* Merger Agreement, Compl. Exh. A). Per the terms of the merger agreement, Choice was to become a wholly-owned subsidiary of Swisher. (Compl. ¶ 45). In exchange, Miller and Rodrigue would receive approximately $5.7 million in cash, and $48.8 million in Swisher common stock in the form of restricted securities. (*See* Compl. ¶¶ 47, 100). The parties also entered into related lock-up agreements and an escrow agreement. (*See* Merger Agreement, Recital E; Compl. Exh. B). The lock-up agreement prohibited Miller and Rodrigue from selling or transferring any of their shares until the filing of a registration statement, and then only 10% of their shares until March 31, 2012. (Compl. ¶ 59). Pursuant to the escrow agreement, Swisher deposited 1,380,000 shares (deducted from the merger consideration) into an escrow fund "as partial security for the indemnification obligations of the Principal Shareholders . . . under the Merger Agreement," which shares were to be released gradually at the end of each quarter. (Compl. ¶ 50, Exh. B at 1). On February 28, 2011, the parties executed a post-closing agreement that adjusted certain terms. (*See* Compl. ¶ 61). Notably,

that agreement permitted Miller and Rodrigue to transfer up to 20% of their shares after they were registered and before March 31, 2012. (Compl. ¶ 62). The merger took place on March 1, 2011. (Compl. ¶ 39). Miller and Rodrigue "retained executive positions with Choice" pursuant to employment agreements with Swisher. (Compl. ¶ 54).

Throughout 2011, Swisher undertook a campaign of rapid expansion. The company averaged approximately one acquisition every week and earned *The Wall Street Journal*'s designation as 2011's "Most Acquisitive Company." (Compl. ¶ 22). The Complaint alleges that Swisher "was not equipped to handle such acquisition-oriented growth." (Compl. ¶ 85). Later disclosures would reveal that "Swisher lacked the necessary internal controls, infrastructure, staffing, and prudent management and accounting procedures and safeguards to properly account for such a rapid acquisition schedule." (Compl. ¶ 81).

On March 28, 2012, Swisher announced that it would be unable to timely report its 2011 year-end financial results. (Compl. ¶ 86). Those reports were delayed because Swisher's Audit Committee was conducting an internal review relating to possible adjustments to the accounting for business acquisitions and the calculation of the allowance of doubtful accounts receivable. (*Id.*) That announcement warned investors that the company's previously issued interim financial statements for the first three quarters of 2011 "should no longer be relied upon." (Compl. ¶¶ 86, 141). Following the announcement, Swisher's stock price fell 9.51% in one day. (Compl. ¶ 89). Within a week, Swisher common stock lost 25% of its value, and continued to decline precipitously thereafter. (*Id.*) The Complaint alleges that "as a result of Huizenga's and Berrard's individual mismanagement of Swisher's internal accounting controls, infrastructure, and staffing, . . .

the consideration that Miller and Rodrigue received for the sale of Choice declined to less than half the value represented in the Merger Agreement." (Compl. ¶ 90).

On April 12, 2012, Swisher announced that, due to its inability to timely report its year-end financials, and due to the requirements of the Securities Act, its registration statements would no longer be effective until the filing of an amendment, which the company planned to file "as soon as practicable." (Compl. ¶ 93). The company also disclosed that it had received a non-compliance letter from NASDAQ in conjunction with its inability to timely file its Form 10-K. (*Id.*)

On May 17, 2012, Swisher announced that it would delay filing its Form 10-Q for the first quarter of 2012 while it continued to conduct the internal review. (Compl. ¶ 95). It also announced that, in conjunction with the internal review, Swisher had determined that Michael Kipp—Swisher's Senior Vice President and Chief Financial Officer—should be separated from the company. (*Id.*) While Swisher was still in non-compliance for listing on NASDAQ, the company announced that it had received an extension from NASDAQ while it continued correcting its financials, and that it would continue trading under the symbol "SWSH." (*Id.*)

Over the next year, Swisher continued to delay its financial reporting while it conducted the internal review and made adjustments. On August 20, 2012, Berrard announced that he would resign as CEO of Swisher, but would continue working with the company as a member of the board of directors. (Compl. ¶ 97). On May 1, 2013, the company announced that a number of its board members had elected not to seek another term, including Huizenga and former Florida Governor Jeb Bush. (Compl. ¶ 107).

On November 15, 2012, Swisher sold Choice to a Canadian company called Progressive Waste Solutions, Ltd. for $123 million. (Compl. ¶¶ 100, 109). That company promptly terminated Miller and Rodrigue. (Compl. ¶ 102). On February 20 and 21, 2013, Swisher issued restated form 10-Qs for the first three quarters of 2011. (Compl. ¶ 92 n.32). By June 5, 2013, Swisher was current on all of its 2011, 2012, and 2013 filings that were delayed as a result of the restatement. (Compl. ¶ 110).

On June 11, 2013, Plaintiffs filed this action naming Swisher, Huizenga, Berrard, and Kipp as Defendants. The complaint contains twelve counts altogether. Count One alleges securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10-b5 promulgated thereunder, against Swisher, Huizenga, and Berrard. Count Two alleges violations of Exchange Act § 20(a) against Huizenga, Berrard, and Kipp. Count Three alleges breach of the merger agreement against Swisher. Count Four alleges breach of the escrow agreement against Swisher. Count Five alleges a breach of fiduciary duty against Huizenga, Berrard, and Kipp. Count Six alleges fraudulent inducement against Swisher, Huizenga, and Berrard. Count Seven alleges negligent misrepresentation against Swisher, Huizenga, and Berrard. Count Eight alleges negligence against Swisher, Huizenga, Berrard, and Kipp. Count Nine alleges violations of Florida's Deceptive and Unfair Trade Practices Act against Swisher. Count Ten alleges violations of Florida's Securities and Investor Protection Act against Swisher, Huizenga, and Berrard. Count Eleven alleges conversion against Swisher. Count Twelve alleges unjust enrichment against Swisher.

## II. LEGAL STANDARD

When faced with a Rule 12(b)(6) motion to dismiss, courts are instructed to "accept as true all well-pleaded allegations and . . . view the complaint in a light most favorable to the [non-movant]." *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). After "assum[ing] the veracity" of these factual allegations, the court is to "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a "complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. LLP*, 213 F.3d 175, 180 (4th Cir. 2000).

## III. DISCUSSION

### A. Counts Three & Four

Counts Three and Four allege breaches of the merger agreement and the escrow agreement, respectively, by Swisher. The parties agree that the merger and lock-up agreements are governed by Delaware law, while the escrow agreement is governed by Florida law. In order to state a claim for breach of contract under either state's law, a plaintiff must plead: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result. *See Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *14 (Del. Ch. 2012); *Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1365 (M.D. Fla. 2007).

Based on the allegations in the Complaint, as well as the exhibits attached thereto, it appears that the merger agreement called for the transfer of nearly eight million shares of Swisher common stock, with 1,380,000 of those shares being placed in escrow. (Compl. ¶ 41). The shares were transferred under Rule 144, making them restricted securities, and it appears that the parties were well aware of this fact beforehand. The lock-up agreement, which was attached as an exhibit to the merger agreement, prohibited Miller and Rodrigue from selling their shares at all until they became registered, and then only 10% of them thereafter until March 31, 2012—one year after the merger. (Compl. ¶ 59). The merger agreement also required Swisher to use all "commercially reasonable efforts" to cause the shares to be registered in a reasonable amount of time, but no later than six months after the merger, and then to use "commercially reasonable efforts" to keep the registration statement continuously effective. (Compl. ¶ 48).

The complaint also alleges that Plaintiffs emphasized throughout the merger negotiations that they wanted to receive freely-tradable shares as soon as possible. This is reflected in a post-closing agreement that the parties executed just before the merger. That agreement amended the lock-up agreement to allow Miller and Rodrigue to sell up to 20% of their shares after they were registered but before the end of March 2012. (Compl. ¶ 62).

The complaint does not appear to allege that Swisher did not timely register the shares. It does, however, allege that *all* of the shares that Miller and Rodrigue received bore a restrictive legend noting that they were subject to a lock-up agreement, effectively preventing their resale. (Compl. ¶ 65). It was not until September 2011 that Plaintiffs received (after much alleged protest) 10% of their shares without the legends, which is noticeably less than the 20% they were supposed to receive per the terms of the post-closing

agreement. (Compl. ¶ 67). Then, in November 2011, Swisher sent an email to Plaintiffs (and others) that categorized them as "insiders" and prohibited them from selling *any* of their shares until further notice. (Compl. ¶ 68). This appears to have been in connection with other acquisitions the company was exploring. (Compl. ¶¶ 69-70).

Because of these delays and restrictions, Plaintiffs allege that they were not permitted to trade their shares in a timely manner, and that by the time they were allowed to, their value had declined precipitously, not the least because of the announcement of the company's improper accounting procedures. On April 12, 2012, in connection with the revelation of its accounting errors, Swisher declared that its registration statements were no longer effective, thus preventing Plaintiffs from trading their shares at all. (Compl. ¶ 93). Plaintiffs also allege that, per the terms of the escrow agreement, Swisher was to release to Plaintiffs a set number of escrow shares at the end of each quarter and that it failed to do so. (Compl. ¶¶ 71-72).

Swisher asks the Court to dismiss Counts Three and Four because, it contends, the clear terms of the contract do not support Plaintiffs' contentions. Notably, it argues that the language of the lock-up agreement contemplated *all* of the share certificates bearing the restrictive legend referenced by Plaintiffs. (Doc. No. 80 at 12, quoting Merger Agreement § 3.9). Swisher argues further that it made sense for all the shares to bear this legend because, even though Plaintiffs were permitted to trade up to 20% of their shares, they were still technically subject to the lock-up agreement. As to Plaintiffs' arguments that it failed to keep its registration statement effective, Swisher argues that it "did not guarantee that its Registration Statement would remain effective; Swisher promised to take 'commercially reasonable efforts' to do so." (Doc. No. 80 at 13).

Swisher's arguments on these points, while well-articulated, would require the Court to interpret the contracts at issue and determine whether Swisher's actions subsequent to their execution constitute breach. This type of determination is not appropriate for a motion to dismiss. Plaintiffs allege, among other things, that Swisher breached the terms of their agreement by failing to timely issue freely-tradable shares and thereafter prohibiting their transfer in other various ways. Whether this is true, and whether it constitutes breach of contract, are questions of fact meant for later stages of litigation.

Similarly, Plaintiffs argue that Swisher breached the terms of the escrow agreement by failing to release the shares held in escrow at the end of each quarter. More specifically, they allege that Swisher failed to send a joint release letter releasing the shares, as required by the terms of the agreement. Swisher responds that "[n]othing in the language of [the agreement] *compels* Swisher to join a letter directing the release of the Escrow Shares," and "[t]he mere fact that Swisher did not issue a joint letter on the timing preferred by Plaintiffs provides no claim for breach of this contractual provision." (Doc. No. 80 at 14). Again, these are questions of fact, and whether they constitute breach is a determination ill-suited for a motion to dismiss. For these reasons, Swisher's motion to dismiss Counts Three and Four is **DENIED**.

### B. Counts One & Two

Count One alleges securities fraud in violation of Exchange Act § 10(b) and corresponding Rule 10b-5. Typically, a claim of securities fraud under this section requires the plaintiff to prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

loss causation." *Matrix Capital Mgmt. Fund v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).[1] Additionally, claims under Section 10(b) must meet the heightened pleading standard under FRCP 9(b), as well as the Private Securities Litigation Reform Act ("PSLRA"). FRCP 9(b) requires that allegations of fraud "state with particularity the circumstances constituting fraud or mistake"; the Rule has been interpreted to require plaintiffs to provide "the who, what when where, and how" of the allegedly fraudulent acts. *In re Mun. Mortg. & Equity, LLC Se. & Derivative Litig.*, 876 F. Supp. 2d 616, 625 (D. Md. 2012) (internal citations omitted). The PSLRA goes a step further, requiring plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). Defendants contend that Plaintiffs have failed to meet this heightened pleading standard, and that they have failed to adequately plead the first three elements of a Section 10(b) claim.

The crux of Defendants' argument is that the complaint does not plead any actionable false statements because the only potentially false statements Plaintiffs can point to—that is, the later-restated financial information from the first three quarters of 2011— was released *after* Plaintiffs purchased their Swisher stock on March 1, 2011. In order for a plaintiff to maintain a suit under Section 10(b), the purchase or sale of the securities must be "in connection with" the alleged fraud. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975); *see SEC v. Pirate Investor LLC*, 580 F.3d 233, 244 (4th Cir. 2009) (noting that the alleged fraudulent activity must "touch" or "coincide" with a securities transaction). Thus, allegedly fraudulent statements which occur after the sale of securities cannot form the basis of a Section 10(b) claim. To the extent Plaintiffs claim the *delay* they

---

[1] The Court notes that "where federal law is at issue, transferee courts are obligated to follow their own interpretation of the relevant law." *Murphy v. FDIC*, 208 F.3d 959, 965 (11th Cir. 2000).

experienced in being able to sell their stock was fraud, (*see supra* Part III.A.), Defendants argue that the Fourth Circuit does not recognize such "deferred sales" claims. *See Gurley v. Documentation, Inc.*, 674 F.2d 253 (4th Cir. 1982) ("We therefore hold that a plaintiff who claims he was fraudulently caused to delay the sale of securities lacks standing to sue under § 10(b) of the 1934 Act.").

Defendants also argue at length that Plaintiffs have failed to adequately plead scienter, which requires allegations that give rise to a "strong inference" that each defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Defendants acknowledge that pleading recklessness is sufficient to satisfy the scienter requirement, but maintain that Plaintiffs have failed to adequately plead recklessness as well.

In response, Plaintiffs do not appear to contest that post-merger conduct cannot form the basis for their securities fraud claims, or that "deferred sales" claims cannot be maintained under Section 10(b). They argue vehemently, however, that the Complaint adequately pleads actionable, pre-merger fraudulent statements, and adequately pleads scienter.

### 1. Material Misrepresentations

In their response to Swisher's motion to dismiss, Plaintiffs set out approximately four pages of quoted portions of their Complaint which they argue adequately plead actionable pre-merger fraudulent statements. (*See* Doc. No. 81 at 16-19). The Court has carefully reviewed these excerpts along with the rest of the allegations in the Complaint, and concludes that none of the allegations contained therein meet the stringent pleading requirements of the PSLRA.

The Fourth Circuit has explained that pleading a false statement or omission of material fact "has two components: (a) a false statement or omission of a fact (b) that is material." *Hillson Partners, Ltd. v. Adage, Inc.*, 42 F.3d 204, 208-09 (4th Cir. 1994). Materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 209 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). While materiality can often be a "fact-specific inquiry," *id.* (quoting *Basic*, 485 U.S. at 240), "[m]ere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)," *id.* (quoting *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993)).

Plaintiffs' allegations of pre-merger fraudulent conduct present several overarching themes: (1) optimistic statements by Defendants about Swisher's ability to expand rapidly through acquisitions; (2) assurances that Plaintiffs would continue to operate Choice, and that Choice would in fact grow rapidly under Swisher, perhaps eventually spinning off into its own company; (3) Defendants' failure to disclose financial information from the fourth quarter of 2010; (4) materially false information contained in financial reports released prior to the Choice merger; and (5) misleading promises that Plaintiffs would receive "freely tradable and liquid" shares.

To begin, Defendants argue that generally optimistic statements about Swisher's future plans are not false and misleading, and that the allegations in the Complaint do not rise above this level. They note portions of the Complaint which allege that Berrard "promised that . . . Swisher could (and would) grow aggressively through successive acquisitions of other waste management companies," and "bragged about how he and his

team were capable of doing a deal a day." (*See* Compl. ¶ 26). The Court agrees that, as a general matter, statements such as these are mere "puffery" and are not actionable under Section 10(b). *See, e.g.*, *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("Soft, puffing statements such as these generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." (internal quotations omitted)). Further, "future business predictions must constitute 'specific guarantees' to be material for the purposes of securities fraud." *Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at \*8 (E.D.N.C. March 22, 2013) (quoting *Raab*, 4 F.3d at 287). Plaintiffs point to no specific guarantees they received about Swisher's growth strategy; in fact, the Complaint itself acknowledges that Plaintiffs were fully aware of Swisher's aggressive rapid-acquisition plan,[2] and impressed with Huizenga's and Berrard's past success with this model. (*See* Compl. ¶ 12). This admitted awareness undercuts Plaintiffs' allegations that they were misled about Swisher's growth strategy, or about the liklihood of its success.

Perhaps Plaintiffs' most pointed allegations in this regard are that Defendants "creat[ed] expectations of optimism which were unrealistically favorable in light of their knowledge or with reckless disregard of the truth concerning the financial strength and stability of Swisher." (Compl. ¶ 115). But Plaintiffs fail to allege any specific facts which could support the idea that Defendants knew or should have known that Swisher was financially unstable at the time of the merger, or that its accounting and controls would

---

[2] Relatedly, a portion of the Complaint also alleges fraud because "from November 3, 2010, through the closing date of March 1, 2011, Swisher engaged in acquisitions of at least seven companies" and Defendants "failed to disclose to the Plaintiffs any information pertaining to these acquisitions." (Compl. ¶ 36). Again, the Complaint itself acknowledges that Swisher was rapidly acquiring companies during this time, and that Plaintiffs were very much aware of this fact; thus, this allegation cannot suffice to state a material misrepresentation.

later prove to be inadequate. Notably, the Complaint fails to sufficiently identify any materially false financial information released prior to the Choice merger, and otherwise does not state with particularity the reasons why Defendants' statements were "unrealistically favorable." Certainly, Swisher was engaged in an aggressive growth-by-acquisition strategy which carried with it inherent risks, but Plaintiffs acknowledge that they were well aware of this plan prior to the merger. (*See* Compl. ¶ 26). Plaintiffs also acknowledge that they "individually and personally, along with their then-legal representative(s), conducted their own due diligence on Swisher," indicating that Plaintiffs were themselves satisfied with the financial health of the company prior to the merger. (*See* Compl. ¶ 32). Without more specific allegations of the falsity of Defendants' statements, then, these alleged "misrepresentations" appear to be little more than general statements of corporate optimism, which are not actionable under Section 10(b). *See Johnson v. Pozen, Inc.*, 2009 WL 426235, at *22 (M.D.N.C. Feb. 19, 2009); *see also Accord Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1993) ("[H]yperbole and speculation cannot give rise to a claim of securities fraud.").

The Court views similarly Plaintiff's allegations that "Huizenga and Berrard each directly represented that Swisher would effectively operate as a bank for Choice's growth," and "Huizenga and Berrard each suggested to Plaintiffs that Choice might eventually be spun off into a public company separate from Swisher." (*See* Compl. ¶ 28). Aside from the fact that Plaintiffs' rights regarding the sale of Choice were governed by contract, explicitly aspirational statements such as these cannot qualify as false statements of material fact. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir.

2014) (noting that aspirational statements "with qualifiers such as 'aims to,' 'wants to,' and 'should'" are too general to constitute a material misrepresentation).

Plaintiffs' argument that they were defrauded because "Swisher failed to disclose to Plaintiffs that . . . [it] had no intention or legal obligation to file any fourth quarter 2010 financial information . . . before closing the Choice merger" is equally unavailing. (*See* Compl. ¶ 121). To begin, Plaintiffs acknowledge that Swisher was under no legal obligation to report this information, and cite no reason or authority that would otherwise create such an obligation. Second, the Court agrees with Defendants that "[a]s highly sophisticated investors, Plaintiffs knew or should have known the law." (Doc. No. 80 at 46). Swisher had yet to report their financials for this quarter, and Plaintiffs presumably either knew or should have been aware of this fact during the merger negotiations. Third, the Court can discern no reason why Plaintiffs could not have sought out this information as part of their merger negotiations, especially since Plaintiffs conducted extensive due diligence on Swisher prior to the merger. Their failure to do so cannot constitute fraud against them.

The Complaint also contains the following allegation regarding Swisher's fourth-quarter financials:

> The fourth-quarter 2010 financial information that Swisher released publicly prior to March 1, 2010 is materially false because it: (i) understates and otherwise does not properly account for Swisher's prior business acquisitions; (ii) does not disclose the weakness or deficiencies in Swisher's internal and financial controls and systems; (iii) understates and otherwise does not properly account for doubtful accounts that Swisher had obtained through its prior business acquisitions; and (iv) understates and otherwise does not properly account for Swisher's substantial losses.

(Compl. ¶ 122). The Court notes first that Plaintiffs' Complaint, in the paragraph immediately preceding this one, alleges fraud because Swisher failed to disclose this

information to Plaintiffs. That the content of this information could also constitute fraud against Plaintiffs is at best contradictory. More important, however, is the fact that this allegation is not plead with the level of particularity required by the PSLRA. Allegations of fraud in this type of case require that "the complaint [] specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). This paragraph, however, is a blanket, kitchen-sink-style allegation that fails to identify precisely what information was false or how it was false. This type of pleading is not permitted under the PSLRA, and the Court finds that it fails to adequately allege a material misrepresentation.

Finally, the Court notes Plaintiffs' allegation that they were misled by promises of "freely tradable and liquid" shares. Here, the Court notes that the merger agreement between the parties specifically provided that the shares sold to Plaintiffs would be restricted securities under Rule 144. Incorporated into that agreement was also a lock-up agreement that specifically prohibited Plaintiffs from transferring a portion of their shares for a year after the merger, and the terms of which were altered by a post-closing agreement between the parties. The Complaint itself, then, demonstrates that Plaintiffs were very much aware of the restrictions on their shares, and any alleged assurances made by Defendants to the contrary cannot constitute material misrepresentations. Plaintiffs' allegations about the liquidity of their shares may form the basis of a breach of contract claim, but they cannot support a claim for securities fraud.

For these reasons, the Court finds that the Complaint fails to adequately identify any material misrepresentations or omissions on the part of Defendants, and fails to adequately plead the first element of a claim for securities fraud under Section 10(b).

## 2. Scienter

Plaintiffs are also required to demonstrate that Defendants acted with the requisite state of mind for securities fraud. In this regard, Plaintiffs broadly allege that Defendants "knew or should have reasonably known, or were recklessly negligent in not knowing that their accounting controls were insufficient for a public company." (Doc. No. 81 at 16). Having carefully reviewed the Complaint, the Court finds that the factual allegations supporting Plaintiffs' assertions do not create the "strong inference" of scienter called for by the PSLRA.

Broadly, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the context of claims under Section 10(b), plaintiffs must allege facts that give rise to a "strong inference" that each defendant acted with "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319, 326, n.6. In addition to intentional conduct, "[p]leading recklessness is sufficient to satisfy the scienter requirement." *BearingPoint*, 576 F.3d at 181. Recklessness is conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

Defendants note that a "strong inference" is one that is "more than merely plausible or reasonable—it [is] cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In making this determination, the "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiffs." *Id.* at 310. Moreover, "[t]o the extent a plaintiff alleges

corporate fraud, the plaintiff 'must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation.'" *BearingPoint*, 576 F.3d at 182 (quoting *Teachers' Retirement Sys. Of L.A. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007)). "To the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant." *Id.*

Echoing their arguments about the timing of Swisher's restated financials, Defendants argue that Plaintiffs may not plead "fraud by hindsight." They note that Plaintiffs' only basis for alleging that Defendants' generally optimistic statements about Swisher were fraudulent is derived from the fact that "*more than a year later*, Swisher announced that problems with its controls might require a restatement." (Doc. No. 80 at 31). They argue that Plaintiffs have failed to identify any facts suggesting that Defendants knew at the time that Swisher's systems and controls were inadequate, and argue that Plaintiffs "merely assert, with perfect 20/20 hindsight, that those systems later proved to be inadequate." (*Id.*)

The Court agrees. As noted similarly *supra* Part III.B.1., Plaintiffs fail to allege sufficient facts to create a strong inference that Defendants knew at the time these optimistic statements were made that Swisher's accounting and controls were inadequate to handle the company's rapid growth. Notably, Plaintiffs fail to sufficiently allege that *any* of the financial reporting errors at issue in this case occurred prior to the Choice merger, or that any of the financial information that was released prior to the merger was later restated. Indeed, Defendants note, and Plaintiffs do not dispute, that none of the financial information released prior to the Choice merger was ever restated. It was not until a year

later that these accounting errors were announced, and Plaintiffs do not explain why or how Defendants knew that these problems would arise. The Court of Appeals has noted that allegations such as these of "'fraud by hindsight' will not satisfy the requirements of Rule 9(b)." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (citations omitted). Allegations of this type also do not meet the requirements of the PSLRA. *See Pipefitters Local*, 2013 WL 1192004, at *13 ("[C]ourts have rejected the 'circular logic' that because a company later disclosed adverse news, executives must have known about the adverse news before it was disclosed yet kept it quiet . . . 'Pleading fraud by hindsight, or Monday morning quarterbacking of this sort, is insufficient pleading under the PSLRA.'" (internal citations omitted)).

To counter the argument that the restatement itself supports an inference of scienter, Defendants rely heavily on *Matrix Capital Mgmt. Fund LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009). In that case, the Court of Appeals affirmed the dismissal of a § 10(b) claim for failure to satisfy the pleading requirement for scienter despite "major internal control problems and large-scale [financial] misstatements" in the defendant company. *Id.* at 188. For a year and a half, the company had misstated financial information on revenue, net income, and other items by tens of millions of dollars, and admitted that its leadership was generally incompetent. *See id.* Auditors revealed that problems in the company's reporting systems were widespread, and that the company was under investigation by the SEC. *See id.* at 179, 183-84.

The court still affirmed the dismissal of the § 10(b) claim leveled against the company, its CEO, and its CFO because "plausible non-culpable inferences are at least as likely as an inference that any defendant acted knowingly or recklessly with respect to the

misstatements." *Id.* at 190. It noted that the company was integrating thirty newly-acquired companies at the time, suggesting negligence on the part of the defendants rather than scienter, and that a restatement undertaken by the company "took a great deal of time and resources," suggesting that the defendants had been previously unaware of the accounting problems. *Id.* at 185, 188, 189.

Defendants argue, and the Court agrees, that the facts surrounding Swisher's restatement are far less troubling than those in *BearingPoint*, and the Court finds the Fourth Circuit's reasoning in that case helpful to this inquiry. In this case, the Complaint itself acknowledges that Swisher's Audit Committee conducted a lengthy and thorough investigation (Compl. ¶¶ 86, 95, 110) and that Swisher's shareholders were kept apprised of changes in personnel (Compl. ¶¶ 96, 97), delays in SEC filings (Compl. ¶¶ 86, 93, 96, 99, 108), and estimated adjustments (Compl. ¶ 96). The Committee's review involved the independent review of over sixty acquisitions that Swisher had made during the time period in question, and actually exceeded the cost of the restatement itself. (Compl. ¶¶ 141-42). These rehabilitative actions suggest openness and negate any inference that Defendants knowingly or recklessly misrepresented Swisher's ability to grow rapidly. Defendants also note the relatively small size of the restatement—the aggregate adjustments resulted in only a $4.8 million increase in net loss before income tax for a company that ultimately had approximately $220 million in revenue for 2011. (*See* Doc. No. 80 at 32; Doc. No. 80-2). While the size of the restatement is certainly not outcome-determinative on the question of scienter, "the relative size of [the company's] revenue stream does bear on whether the misstatements of net income were of a size that [the company's] officers must have known about them." *BearingPoint*, 576 F.3d at 184-85.

Having carefully reviewed the Complaint and the parties' arguments, the Court concludes that the nonculpable explanations for Swisher's financial difficulties offered by Defendants are much more compelling than any inference of scienter offered by Plaintiffs. Defendant Berrard's memorandum puts it best:

> [T]he accounting errors occurred, as the Plaintiffs repeatedly point out in their Complaint, during a hectic period of tremendous growth when Swisher was acquiring and integrating numerous (over sixty) companies. Given this growth, it is unfortunate yet unsurprising that complicated accounting issues arose and that honest mistakes may have unintentionally occurred under demanding time pressures. Rather than suggesting scienter, this surrounding context . . . indicates that the acquisitions simply overwhelmed and outgrew Swisher's accounting personnel and capabilities.

(Doc. No. 75 at 9). Indeed, for a company that earned *The Wall Street Journal*'s designation as 2011's "Most Acquisitive Company," (Compl. ¶ 22), the fact that Swisher's rapid-acquisition plan eventually outgrew its controls is hardly shocking. Defendants' business model was aggressive, and carried with it inherent risks—risks of which Plaintiffs appear to have been fully aware. Defendants' undertaking these risks in the hopes of creating a successful business venture does not constitute fraud against the Plaintiffs. The Court also notes—and the Complaint acknowledges—that Defendants Huizenga and Berrard had employed a similar business model in the past and experienced "mega-success." (Compl. ¶ 25). That they expected to experience this same success with Swisher, then, is entirely plausible, and creates a powerful inference that their statements of optimism were genuine and neither intentionally false nor reckless.

Plaintiffs also argue in their brief that "the terminations and resignations of board members, officers, and key personnel" in the company bolsters an inference of scienter. (*See* Doc. No. 81 at 26). But without more factual support for this assertion, "[s]ubsequent resignations by executives are insufficient to support a strong inference of scienter." *Iron*

*Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 593-594 (E.D. Va. 2006) (citing *Southland Sec. Corp. v. Inspire Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004); *Stambaugh v. Corrpro Cos., Inc.*, 116 F. App'x 592, 596-97 (6th Cir. 2004)). Nor do the individual Defendants' high-level positions within the company support an inference of scienter. *See id.* at 592 ("[H]olding an executive position alone does not necessarily lead one to infer that [i]ndividual [d]efendants knew that the alleged omissions were false or misleading.").[3]

Thus, having carefully reviewed the Complaint and the parties' arguments, the Court finds that the allegations in the Complaint, taken collectively, do not give rise to a strong inference of scienter. Therefore, Count One must be dismissed against all Defendants.

### 3. Liability under Exchange Act § 20(a)

Count Two alleges violation of § 20(a) of the Exchange Act against Defendants Huizenga, Berrard, and Kipp. That section makes liable any person who "directly or indirectly, controls any person liable" for violating the Exchange Act or its regulations, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). However, "[b]ecause the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation of § 10(b)(5), it also fails with respect to the § 20(a) claims." *BearingPoint*, 576 F.3d at 192. Accordingly, Count Two is dismissed against all Defendants.

---

[3] To the extent Plaintiffs attempt to argue that the Sarbanes-Oxley certifications signed by Berrard and Kipp after Plaintiffs acquired their shares support an inference of scienter, "[i]t is well established that scienter cannot be inferred from the signing of a Sarbanes-Oxley certification." *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *16 (D. Md. Mar. 28, 2013) (citing *BearingPoint*, 576 F.3d at 177-78, 196).

### C. Counts Five & Eight

Count Five alleges breach of fiduciary duty against Defendants Huizenga, Berrard, and Kipp; Count Eight alleges negligence against Swisher, Huizenga, Berrard, and Kipp. Defendants argue that these counts must be dismissed because they are derivative claims which belong to the company, and Plaintiffs have failed to comply with the prerequisites of FRCP 23.1.

Whether a claim is a direct or a derivative one depends on (1) "who suffered the alleged harm (the corporation or the stockholders)" and (2) "who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenerette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).[4] Ultimately, "[t]o state a direct claim, the shareholder must allege . . . an injury that is different from what is suffered by other shareholders." *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003). Moreover, "the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." *In re Paxson Commc'ns Corp. S'holders Litig.*, 2001 WL 812028, at *4 (Del. Ch. July 12, 2001) (quoting *Moran v. Household Int'l Inc.*, 490 A.2d 1059 (Del. 1985)).

As an initial matter, the Court notes, and Plaintiffs appear to concede, that that since they were not Swisher shareholders until after the merger, their fiduciary duty claims against Swisher's directors and officers must be based solely on post-merger conduct. (*See*

---

[4] Because Swisher is a Delaware corporation, Delaware law applies to these claims. *See LaSala v. Bordier et Cie*, 519 F.3d 121, 131 n.13 (3d Cir. 2008) ("The parties agree that Delaware law applies to the breach-of-fiduciary-duty counts. This is clearly correct, as the claims involve the corporation's internal affairs, and the state of incorporation is Delaware.").

Doc. No. 83 at 15).[5] Otherwise, the Court has carefully reviewed the allegations supporting these two claims, and it appears that both the conduct and the harm alleged concern the decline in the value of Swisher's stock. (*See* Compl. ¶ 181 ("Defendants . . . breached their fiduciary duties to Plaintiffs by making false and misleading material statements and omitting material facts to Plaintiffs and other shareholders in the press releases and financial statements filed with the SEC."); *see also* Compl. ¶ 184 ("Defendants['] . . . breaches proximately caused damage to Plaintiffs because their false statements, omissions, and lack of oversight caused Swisher's stock and Plaintiffs' consideration . . . to decline in value."); Compl. ¶ 203 ("[Defendants' actions] caused the value of the stock to decline, thereby causing the consideration that Plaintiffs received . . . to substantially decline in value.")).

The Court agrees that these are classic derivative claims. Plaintiffs allege that Defendants' actions caused the decline in the value of Swisher stock, which is a harm suffered by all Swisher shareholders. Because these claims allege harm to the corporation, the claims belong to the corporation, and Plaintiffs may not bring them individually. Plaintiffs' failure to comply with the provisions of Rule 23.1, then, mandates dismissal of these claims.

### D.  Remaining Claims

Having dismissed Plaintiffs' federal securities and derivative claims, the Court finds that this action no longer presents the same factual issues shared by the other cases in this MDL. The remainder of Plaintiffs' claims—notably the breach of contract claims—

---

[5] Defendants also note, and Plaintiffs do not appear to contest, that the claim against Swisher itself should be dismissed because a corporation does not owe fiduciary duties to its shareholders. *See In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301, at *6 (Del. Ch. Aug. 22, 1991) ("[A] corporation qua corporate entity is not a fiduciary of, and thus cannot owe a fiduciary to, its shareholders.").

center around facts that precede the allegedly improper accounting practices at issue in this MDL, and that are unique to these Plaintiffs. Moreover, it appears to the Court that portions of Plaintiffs' remaining claims present unique issues of Florida law, and the interpretation of Florida statutes, which would most appropriately be resolved by a court in Florida. As a result, the Court finds that this case will not benefit from further coordinated proceedings in this MDL. Accordingly, Defendants' motions to dismiss the remaining claims are **DENIED** without prejudice. The Court will recommend to the MDL Panel that this case be transferred back to the Southern District of Florida.

**IT IS THEREFORE ORDERED** that Defendants' Motions to Dismiss (Doc. Nos. 74, 76, 78, & 79) are **GRANTED in part and DENIED in part** as follows:

1. Counts One, Two, Five, and Eight are **DISMISSED** as to all Defendants;

2. Defendant Kipp is **DISMISSED**;

3. Defendant Swisher's Motion as to Counts Three and Four is **DENIED**; and

4. Defendants' motions as to the remaining claims are **DENIED** without prejudice.

The Court will recommend to the MDL Panel that this action be transferred back to the Southern District of Florida for such further proceedings as that court deems appropriate.

**SO ORDERED.**

Signed: July 8, 2015

Graham C. Mullen
United States District Judge